**FILED**

DEC 1 2008

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**RICHARD D. McCROBIE,**

       **Plaintiff,**

*vs.*
                                  **Civil Action No. 3:08CV42**
                                  **(Judge Robert E. Maxwell)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Richard D. McCrobie brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 83.12.

## I. Procedural History

Richard D. McCrobie ("Plaintiff") filed an application for SSI and DIB on December 2, 2004, alleging disability since July 21, 2004, due to knee pain and hypertension (R. 57-58, 153, 345). The state agency denied Plaintiff's application initially and on reconsideration (R. 46-48, 58-62, 71-72,76). Plaintiff requested a hearing, which Administrative Law Judge Donald T. McDougall ("ALJ") held on September 20, 2006, at Bridgeport, West Virginia, and at which Plaintiff, represented by counsel, Phil Isner, and Larry Bell, a vocational expert ("VE") testified (R.

362-94). On December 11, 2006, the ALJ entered a decision finding Plaintiff was not disabled (R. 20-33). On December 14, 2007, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 4-7).

## II. Statement of Facts

At the time of the administrative hearing, Plaintiff was forty-four (44) years (R. 368). Plaintiff graduated high school (R. 77). His past work included manual laborer and skidder operator (R. 379, 381).

On July 16, 1997, Richard Topping, Jr., M.D., completed an Operative Report of Plaintiff. Plaintiff had undergone an "arthroscopy pinning osteochondral fracture medial femoral condyle"; "arthroscopic partial medial meniscectomy"; and "arthroscopic removal of loose body." Dr. Topping's post operative diagnosis was for the following: "1) Grade III and IV changed medial femoral condyle with loose OCD lesion involving approximately 30% medial femoral condyle[1]. 2) Loose body suprapatellar pouch. 3) Degenerative tear posterior horn medial meniscus" (R. 150).

On March 15, 1999, Dr. Topping noted Plaintiff had "been back at work." Plaintiff reported he performed most of his job in the sitting position and had "no giving way," no catching, and no locking of his knees. Plaintiff reported he experienced pain "by the end of the week," but he treated it with Motrin "occasionally." Upon examination, Dr. Topping noted Plaintiff's left knee had a range of motion that was "lacking 7 degrees of extension to flexing 130." Dr. Topping found "some mild medial joint line tenderness," trace valgus instability, negative varus, and negative anterior/posterior "Drawer." Dr. Topping found Plaintiff had a "4% permanent/partial impairment

---

[1]Medial femoral condyle: a rounded projection on a bone; pertaining to the femur which, distally along with the patella and tibia, forms the knee joint; pertaining to the middle. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 489. 406, 682, 1110

of the whole person." Plaintiff reported he did not want to "pursue" a high tibial osteotomy. Dr. Topping recommended Plaintiff continue "watching his weight" and exercising (R. 158).

On March 27, 2002, Plaintiff presented to Aamer Rahman, M.D., for treatment of hypertension. Plaintiff reported he treated his hypertension with Norvasc. Plaintiff's blood pressure was 150/110. Dr. Rahman instructed Plaintiff to return in three days (R. 185).

On April 1, 2002, Plaintiff presented to Dr. Rahman for a follow-up examination. Plaintiff's blood pressure was 130/100. Dr. Rahman prescribed Antivert (R. 185).

On June 28, 2002, Plaintiff returned to Dr. Rahman for follow-up examination. Plaintiff reported he felt "good," but he had been experiencing headaches. Plaintiff reported forgetfulness. Plaintiff's blood pressure was 130/96. Dr. Rahman's examination of Plaintiff's HEENT, heart, and lungs showed normal results. Dr. Rahman diagnosed hypertension and advised Plaintiff to "watch salt" (R. 186).

On August 8, 2002, Plaintiff complained of dizziness, headaches and nausea to Dr. Rahman. Plaintiff reported he had not taken his hypertension medications. Plaintiff's HEENT and lung examinations were normal. Dr. Rahman prescribed Antivert (R. 188).

On August 14, 2002, Dr. Rahman noted Plaintiff's hypertension was "still not controlled" (R. 189).

On September 9, 2002, Plaintiff was examined by Dr. Rahman, who found Plaintiff's HEENT, heart, and lung examinations were normal. Dr. Rahman prescribed Norvasc for Plaintiff's hypertension. Dr. Rahman noted Plaintiff's gout was stable (R. 197).

On December 12, 2002, Plaintiff requested Dr. Rahman refill his gout and hypertension medications. Dr. Rahman prescribed Norvasc and Mavik (R. 198).

On January 29, 2004, Plaintiff received a third Supartz injection from Dr. Topping. Plaintiff reported he had not realized any relief from this course of treatment. Dr. Topping's examination of Plaintiff revealed no erythema, warmth or effusion. Dr. Topping scheduled Plaintiff's fourth Supartz injection for the following week (R. 157).

On February 12, 2004, Dr. Topping administered a fifth Supartz injection to Plaintiff's left knee. Plaintiff reported intermittent pain. Plaintiff stated he experienced difficulty rising from a seated position and ascending/descending stairs. Upon examination, Dr. Topping found no erythema, warmth, or effusion. Dr. Topping instructed Plaintiff to return to his care in six months; he provided Plaintiff with samples of Bextra (R. 159).

On March 18, 2004, Plaintiff reported to Dr. Topping he did not realize any relief from his medial sided knee pain with the treatment of Supartz. Dr. Topping diagnosed post-traumatic arthritis of Plaintiff's left knee (R. 156).

On April 2, 2004, Plaintiff again reported to Dr. Topping that he realized no relief from Supartz. Dr. Topping discussed Plaintiff's treatment options with him as to his knee, which included conservative care, bracing, high tibial osteotomy, unicondylar, and total knee replacement. Dr. Topping informed Plaintiff that total knee replacement at his age would require multiple revisions. Plaintiff decided to undergo a high tibial osteotomy (R. 154).

On May 21, 2004, Plaintiff reported to Dr. Topping that he was in "a lot of pain." He stated his "knee [was] catching" and he had significant medial side pain. Plaintiff reported he was working, but a minimal amount. Dr. Topping prescribed Ultram (R. 155).

On June 16, 2004, an ECG was completed. It was abnormal. It showed a left bundle branch block (R. 193). Plaintiff had a chest x-ray made; it was negative (R. 194, 258).

On June 16, 2004, Plaintiff presented to Dr. Rahman with complaints of high blood pressure. Plaintiff stated he had experienced headaches and nausea. He experienced no loss of strength or sensation, but felt weak and fatigued. Plaintiff reported no eye, ear, nose, mouth, throat, or cardiac conditions or complaints. Plaintiff reported shortness of breath. Plaintiff medicated with Norvasc, Allopurinol, Tenormin, and Mavik (R. 180). Plaintiff's weight was 245 pounds and his blood pressure was 182/120 (R. 181). Plaintiff's motor strength was 5/5. Plaintiff's cranial nerves and sensory were grossly intact. Dr. Rahman diagnosed hypertensive urgency. Dr. Rahman noted Plaintiff's "EKG show[ed] LBBB, new as compared to EKG in 1997" (R. 182).

On June 23, 2004, Plaintiff reported to Dr. Rahman for a recheck of his hypertension. Plaintiff reported he no longer had a headache or other complaints (R. 177). Plaintiff's neck, respiratory, head, ear, nose, throat, neck, and cardiac examinations were normal (R. 177, 179). He had no fever, chills, weight loss, weight gain, weakness, fatigue, lack of energy, sweats, or heat or cold intolerances. Plaintiff medicated with Norvasc, Allopurinol, Tenormin, and Mavik. Plaintiff reported his past medical history included hypertension, gout, and arthritis (R. 177). Plaintiff's weight was 245 and his blood pressure was 162/110 (R. 178). Dr. Rahman diagnosed hypertension and instructed Plaintiff to return in two months (R. 179).

On June 25, 2004, Plaintiff reported to Dr. Topping that he continued to have medial knee pain, which limited his ability to move and to complete tasks. Upon examination, Dr. Topping opined Plaintiff had varus alignment[2] and "a little bit of medial joint line tenderness." Plaintiff was grossly neurovascularly intact distally. The x-ray that Dr. Topping reviewed showed "varus

---

[2]Varus: Bent or twisted inward; denoting a deformity in which the angulation of the part is toward the midline of the body. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 2009.

alignment complete loss of the medial joint space" and "a little bit of patellofemoral spurring and small posterior femoral osteophyte.[3]" Dr. Topping discussed Plaintiff's undergoing a high tibial osteotomy[4] with him (R. 153).

On June 25, 2004, Plaintiff reported to Dr. Rahman for surgical clearance for knee surgery, which was to be performed by Dr. Topping. Plaintiff had no fever, chills, weight loss, weight gain, weakness, fatigue, lack of energy, sweats, or heat or cold intolerances. His neck, respiratory, cardiac, GI, GU, endocrine, eye, ear, nose, throat, and neurological examinations were normal (R. 173-74, 176). Plaintiff medicated with Norvasc, Allopurinol, Tenormin, Mavik, Toprol, and Clonidine (R. 174). Plaintiff's weight was 246 pounds and his blood pressure was 142/96. Dr. Rahman noted Plaintiff was alert and in no acute distress (R. 175). Dr. Rahman cleared Plaintiff for knee surgery (R. 176).

On July 19, 2004, Plaintiff presented to Dr. Rahman for elevated blood pressure (R. 240). His blood pressure was 138/102 (R. 241). Dr. Rahman prescribed Lotrel (R. 242).

On July 21, 2004, Plaintiff had an ultrasound made of his kidneys, as ordered by Dr. Rahman. It showed a "possible small right renal cyst" but "no other obvious abnormalities" (R. 201, 257).

On August 4, 2004, Plaintiff reported to Dr. Topping that he had left knee pain. Dr. Topping noted Plaintiff had had a varus alignment and had failed to "respond to exhaustive medical treatment." Upon examination, Dr. Topping noted Plaintiff was afebrile. His blood pressure was

---

[3]Osteophyte: A bony excrescence or osseous outgrowth. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 1336.

[4]Osteotomy: A surgical cutting of a bone. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 1137.

150/98. He had a regular heart rate and rhythm. Plaintiff's knee range of motion "range[d] from 0 to 120." There was no evidence of valgus instability; Plaintiff was neurovascularly intact. The x-rays showed "varus knee with medial compartment disease" (R. 151, 203).

Also on August 4, 2004, Plaintiff underwent a "high tibial osteotomy of valgus closing wedge." Dr. Topping's post-operative diagnosis was for "genu varum left knee, degenerative joint disease left knee." There were no complications and all "counts were correct" (R. 152, 205).

Plaintiff's August 4, 2004, x-ray made of his left knee during "internal fixation of the tibial plateau with a plate and screw devise [sic]" showed "[p]osition and alignment . . . grossly anatomic" (R. 204).

On January 6, 2005, Plaintiff presented to Dr. Topping with complaints of knee pain. Plaintiff reported "a little bit of improvement over his preoperative status when he [was] sitting [or] resting"; Plaintiff did not discern "much difference" in his knee symptoms when he walked. Dr. Topping opined that Plaintiff's x-rays showed "radiographic union of his high tibial osteotomy." Dr. Topping noted Plaintiff's tibial femoral axis was thirteen degrees and his osteotomy sight had healed. Dr. Topping found Plaintiff "still [had] a lot of trouble with his knee status post high tibial osteotomy." Plaintiff's pain was "lateral over the hardware." Dr. Topping informed Plaintiff that the hardware could be removed if the pain persisted. Dr. Topping discussed total knee replacement with Plaintiff in the event that hardware removal did not improve his condition. Plaintiff was agreeable to this treatment plan. Dr. Topping prescribed Ultracet to aid Plaintiff in resting (R. 149).

On January 17, 2005, Fulvio R. Franyutti, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and or carry ten pounds, frequently lift and/or carry ten pounds, stand and/or walk

for a total of about two hours in an eight-hour work day, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited. Dr. Franyutti justified his stand/walk limitation of Plaintiff by noting Plaintiff had undergone a high tibial osteotomy, had persistent pain, had abnormal gait, and used a cane (R. 270). Dr. Franyutti found Plaintiff could occasionally climb ramps and stairs, balance, and stoop. He found Plaintiff could never climb ladders, ropes, scaffolds, kneel, crouch, or crawl (R. 271). Dr. Franyutti found Plaintiff had no manipulative, visual, or communicative limitations (R. 272-73). Dr. Franyutti found Plaintiff had no limitations in his exposure to wetness, humidity, noise, fumes, odors, dusts, gasses, and poor ventilation. Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold and heat, vibration, and hazards and should avoid all exposure to heights due to left knee high tibial osteotomy, abnormal gait, cane use, and persistent pain (R. 273). Dr. Franyutti found Plaintiff was credible. He reduced Plaintiff's RFC to sedentary (R. 274). Dr Franyutti noted he agreed with Dr. Topping's November 29, 2004, opinion that Plaintiff was unable to return to regular work, but "could only do something sedentary at this point" (R. 275).

On January 26, 2005, Plaintiff presented to Dr. Rahman for refills of his prescription medications. Plaintiff reported he had undergone "knee surgery . . . by Dr. Topping but [it] ha[d] not helped a whole lot." Dr. Rahman's examination of Plaintiff's eyes, ears, nose, mouth, throat, neck, respiratory system, cardiac system, GI system, and head produced normal results (R. 236-38). Plaintiff presented with no fever, chills, weight loss or gain, weakness, fatigue, lack of energy, sweats, or heat or cold intolerances. He medicated with Norvasc, Allopurinol, Tenormin, Mavik, Toprol, Clonidine, and Lotrel (R. 236). Plaintiff's blood pressure was 140/100 (R. 237). Dr. Rahman's assessment was for benign hypertension. Plaintiff requested a "fluid pill," as he

experienced "bilateral dependant leg swelling." Dr. Rahman prescribed Hydrochlorothiazide; he prescribed Pevacid for Plaintiff's worsening heartburn (R. 238).

On February 9, 2005, James Capage, Ph.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had no medically determinable mental impairment (R. 134). Dr. Capage noted Plaintiff followed "instructions fairly well if understand [sic] them. [Got] along w/authority figures pretty well as long as . . . treated w/respect." Dr. Capage noted Plaintiff claimed he did not "handle stress too well – [got] upset when [could]n't do something that used to." Dr. Capage found Plaintiff had no mental allegations and "seem[ed] to be credible" (R. 146).

On February 10, 2005, Plaintiff was examined by Dr. Rahman. He found Plaintiff had no fever, chills, weight loss or gain, weakness, fatigue, lack of energy, sweats, or heat or cold intolerances (R. 233). Dr. Rahman's examinations of Plaintiff's eyes, ears, nose, mouth, throat, neck, respiratory system, cardiac system, and GI system produced normal results (R. 233, 234). Plaintiff reported his medical history was positive for hypertension, gout, and arthritis (R. 233). Plaintiff's blood pressure was 160/100 (R. 234). Dr. Rahman diagnosed hypertension. He suspended Plaintiff's use of Lotrel because it "worsen[ed] creatinine"; he increased dosages of Clonidine and Norvasc. Dr. Rahman noted Plaintiff's glucose intolerance was caused by no exercise and weight gain. Dr. Rahman diagnosed Allopurinol for Plaintiff's gout (R. 235).

The results of Plaintiff's February 24, 2005, blood work showed normal ranges, except for Plaintiff's serum glucose and serum Creatinine, which were elevated (R. 208, 263).

Plaintiff was treated by Dr. Rahman on February 24, 2005. Plaintiff reported he had experienced "a little" back pain during the past few weeks. Dr. Rahman observed Plaintiff favored one knee and presented with no neurological symptoms. Dr. Rahman found Plaintiff had no fever,

chills, weight loss, weight gain, weakness, fatigue, lack of energy, sweats, or heat or cold intolerances (R. 230). Dr. Rahman's examination of Plaintiff revealed his eye, ear, nose, mouth, throat, neck respiratory, cardiac, and GI systems were normal (R. 230, 232). Plaintiff reported medicating with Norvasc, Allopurinol, Tenormin, Mavik, Toprol, Prevacid, Hydrochlorothiazide, and Clonidine (R. 230). Plaintiff's blood pressure was 130/84 (R. 231). Dr. Rahman diagnosed hypertension and back pain. Dr. Rahman prescribed Lotrel and noted he would "keep an eye on renal function." Dr. Rahman also noted Plaintiff's back pain was caused by "left sided thoracic paraspinal muscles spasm most likely due to left knee" (R. 232).

On April 11, 2005, Plaintiff was examined by Dr. Topping for medial side knee pain. Plaintiff reported he was "still doing poorly"; he did not have pain when he sat but pain was present when he walked. Plaintiff reported no lateral side pain. On examination, Plaintiff's knee examination produced five-degree flexion contracture. He had no varus or valgus instability. X-rays reviewed that day by Dr. Topping revealed neutral tibial femoral axis and bone-to-bone opposition of his medial compartment. Dr. Topping opined Plaintiff had "not had much improvement at this point after his high tibial osteotomy." Dr. Topping discussed performing a revision osteotomy or a total knee replacement with Plaintiff. Plaintiff reported he desired to avoid surgery and that he was applying for disability. Dr. Topping opined Plaintiff was "unlikely to be able to return to any work which would require standing, walking for anything more than a minimal amount of time." Dr. Topping also opined that "[i]f sedentary work were available he could qualify for this by his knee problem." Plaintiff was instructed to return in nine to twelve months (R. 148).

On May 1, 2005, Plaintiff underwent a thoracic spine MRI for complaints of back pain. It was negative (R. 171, 249, 256).

Also on May 1, 2005, Plaintiff underwent a lumbar MRI for back pain. It showed minimal disc degeneration at L3-4 and L4-5. It showed "some facet joint hypertrophy at L4-5 bilaterally." Steven Barnett, M.D., who interpreted the MRI, opined he did not "see . . . frank disc herniation, spinal stenosis or direct neural impingement" (R. 172, 248, 255).

On May 23, 2005, Plaintiff's lab work showed Plaintiff's serum glucose at 113 (normal range was 65-99); serum Creatinine at 1.6 (normal range was 0.5-1.5); and serum uric acid at 9.2 (normal range was 2.4-8.2). Plaintiff's BUN/Creatinine level was within normal range (R. 247, 262).

On May 25, 2005, Plaintiff reported to Dr. Rahman that he had "been doing well and taking all meds regularly." Dr. Rahman's examination of Plaintiff revealed no fever, chills, weight loss, weight gain, weakness, fatigue, lack of energy, sweats, or heat or cold intolerances. Plaintiff's respiratory, cardiac, and GI systems were normal. Plaintiff listed his symptoms as hypertension, gout, arthritis, renal insufficiency, severe knee arthritis, and back pain (R. 227). Plaintiff's blood pressure was 148/120. Dr. Rahman noted Plaintiff was alert and in no acute distress. Dr. Rahman's examination of Plaintiff's head, ears, nose, throat, mouth, and neck were normal (R. 228-29). Dr. Rahman diagnosed hypertension and increased Plaintiff's dosage of Toprol. Dr. Rahman prescribed Allopurinol for gout and Prevacid for GERD. Dr. Rahman noted Plaintiff's Creatinine levels improved after Plaintiff ceased medicating with Lotrel. Plaintiff informed Dr. Rahman that he had been in discussions with Dr. Topping about treating his knee pain with a knee replacement (R. 229).

On June 20, 2005, Plaintiff serum uric acid level was within normal range (R. 261)

On June 20, 2005, Plaintiff presented to Joseph A. Noronha, M.D., with complaints of gout. Plaintiff informed Dr. Noronha he had had gout for fifteen years, and he medicated the condition with Allopurinol. Plaintiff stated his ankles were mostly affected by the condition. Plaintiff listed

his medications as Norvasc, Allopurinol, Tenormin, Mavik, Toprol, Prevacid, Hydrochlorothiazide, and Clonidine (R. 224). Plaintiff reported he resided with a stable family, he did not consume alcohol, and he used smokeless tobacco. Plaintiff's blood pressure was 142/80 (R. 225). Upon examination, Dr. Noronha opined Plaintiff's feet were cool; he had wasting of toe pads; there were no distal pulses; Plaintiff had tenderness over left foot instep and medial malleolus; there was no swelling; there was no increased heat. Dr. Noronha opined Plaintiff's symptoms were "suggestive of acute gout." He prescribed Colchicine (R. 226).

On June 21, 2005, Plaintiff reported to the emergency department of Davis Memorial Hospital with complaints of left ankle pain (R. 166). Plaintiff reported his pain was severe, exacerbated by walking, and relieved by "nothing" (R. 167). Upon physical examination, the emergency department physician noted Plaintiff had tenderness in his ankle. Plaintiff was oriented, times three; his sensation was intact; his motor strength was intact. He was positive for erythema. Plaintiff was diagnosed with ankle pain. He was prescribed Anaprox and Vicodin and released to home when his condition had improved and he was stable (R. 168).

On June 28, 2005, Plaintiff presented to James J. DeMarco, M.D., upon referral from Dr. Rahman. Plaintiff reported his past medical history was positive for high blood pressure, wearing glasses, arthritis, and tobacco use. Dr. DeMarco found no foot or ankle pain (R. 210, 251). Plaintiff's blood pressure was 120/90. Dr. DeMarco noted Plaintiff reported he had been positive for hypertension for ten years and had been "taken off Norvasc and Mavik." Dr. DeMarco's examination of Plaintiff's head, neck, cardiovascular system, lungs, and abdomen were normal. There was trace leg edema in Plaintiff's extremities. Plaintiff's Creatinine was 1.9. Dr. DeMarco diagnosed mild chronic renal failure, hypertension, and proteinuria. Dr. DeMarco's follow-up plan

was for Plaintiff to have his renal chemicals rechecked and instructed Plaintiff to return in a "couple months" (R. 211, 250, 317-18).

On July 7, 2005, Robert A. Rose, M.D., completed a duplex scan and pulse volume recorder measurement of Plaintiff's arteries in his legs for reported left hip and buttock pain that radiated to Plaintiff's lower back and was associated with walking. Dr. Rose opined Plaintiff had "good multiphasic wave forms" from his femoral to his dorsalis pedis. His impression was for "no evidence of arterial obstruction to account for the patient's pain" (R. 162, 252, 260).

On July 14, 2005, Plaintiff underwent an ultrasound on his kidney for what was listed as "chronic renal failure." The exam was limited due to bowel gas. It showed no gross abnormality. It showed a small cyst in the upper pole of the right kidney (R. 160, 254).

Also on July 14, 2005, an ultrasound was made of Plaintiff's abdominal aorta due to "chronic renal failure." Visualization was limited due to the presence of bowel gas. It showed that Plaintiff's "mid abdominal aorta measure[d] 3.0 x 2.0 cm consistent with an abdominal aortic aneurysm" (R. 161, 253).

On September 7, 2005, Plaintiff presented to Dr. Parviz to "discuss health issues." Plaintiff recounted the history of his present illness as follows: could not focus on anything; experienced back and leg pain; was impatient; could not "go out and do anything because of pain"; experienced dizziness and stomach "weak[ness]"; and felt depressed. Plaintiff reported his pain was eight on a scale of one-to-ten; he had been treated with Ultracet for his left knee pain; Dr. DeMarco treated Plaintiff for renal insufficiency. Plaintiff reported he lived alone; he was divorced; he did not have any suicidal thoughts or ideations (R. 221). Plaintiff reported he medicated with Allopurinol, Toprol, Prevacid, Hydrochlorothiazide, and Clonidiene. Plaintiff informed Dr. Parviz that his

medical history included gout, hypertension, arthritis, renal insufficiency, severe knee arthritis, back pain, and severe bilateral leg claudication. Plaintiff reported he had undergone left knee surgery in August 2004, and he had had no overnight hospital stays (R. 221). Plaintiff reported he "reside[d] in a stable nuclear family"; he used smokeless tobacco; he did not use alcohol. Plaintiff's blood pressure was 128/98. Upon examination, Dr. Parviz noted Plaintiff was alert and appeared depressed (R. 222). Dr. Parviz's examinations of Plaintiff's head, eyes, ears, nose, throat, neck, thyroid, lungs, and heart produced normal results. Dr. Parviz assessed severe depression, anxiety, mild renal insufficiency, and degenerative joint disease of the lumbar spine. Dr. Parviz noted he ceased Plaintiff's use of Ultracet "because of possibility of serotonin syndrome with SSRI." He prescribed Effexor and Lortab (R. 223).

On September 27, 2005, Plaintiff presented to Dr. Parviz and informed him that "with the medication he d[id] not feel as edgy as before but has not helped a whole bit. He sa[id] his social environment has not changed because his leg and back pain. He was asking to refill for his Lortab as sa[id] it helped his pain. Patient sa[id] he tolerated Effexor very well." Plaintiff stated his past medical history included gout, hypertension, arthritis, renal insufficiency, severe knee arthritis, back pain, severe bilateral leg claudication, and depression (R. 218). Plaintiff's blood pressure was 110/78. Plaintiff informed Dr. Parviz that he used smokeless tobacco. Upon examination, Dr. Parviz noted Plaintiff was alert and in no acute distress. Plaintiff's respiratory and lung examinations were normal (R. 219). Plaintiff's heart examination was normal. Dr. Parviz diagnosed depression and prescribed Effexor. He instructed Plaintiff to return to his care in one month (R. 220).

On October 20, 2005, Plaintiff presented to Alicia Johns, PA-C to Dr. Topping, for an

evaluation of his left "tib/fib." Plaintiff reported he had fallen and had sustained an "an injury to the anterior aspect of his tibia," a laceration and bruise. He experienced "pain with flexion/extension of his ankle along with continued swelling." Plaintiff reported a "small amount of redness around his laceration." Upon examination, P.A. Johns found Plaintiff's laceration was healing, but there was a small amount of redness, bruising, and swelling. Plaintiff had no cellulitis. Pain was present at Plaintiff's "anterior tibialis with flexion/extension of his ankle." P.A. Johns opined Plaintiff was neurovascularly intact. P. A. Johns diagnosed left tibia contusion. P. A. Johns and Plaintiff discussed his "continu[ing] with activities as tolerated." Plaintiff was instructed to return "if any further problems persist" (R. 277). Dr. Topping reviewed Plaintiff's x-rays and opined the "hardware in the proximal tibia consistent with his high tibia osteotomy." He saw "no diaphyseal or distal metaphyseal abnormality" (R. 278).

Also on October 20, 2005, Dr. Topping completed a Medical Opinion Re: Ability to do Work-Related Activities (Physical). He found Plaintiff could not lift or carry any weight on an occasional or frequent basis. Dr. Topping found Plaintiff could not stand or walk for any period of time during an eight-hour workday. He opined Plaintiff was "unable to sit for extended period of time" (R. 266). Dr. Topping found Plaintiff could neither sit nor stand for any length of time before changing positions. Dr. Topping found Plaintiff did not need to "walk around"; however, he found Plaintiff needed to walk for five minutes when he "walked around." Dr. Topping found Plaintiff needed to shift at will from sitting or standing/walking and needed to lie down at "unpredictable intervals during a work shift"; but he noted it was "unknown" as to how often Plaintiff would have to lie down. Dr. Topping answered, when asked, "What medical findings support the limitations described . . . ?," that Plaintiff "had a previous tibial osteotomy and must frequently change positions

to avoid pain and stiffness." Dr. Topping opined Plaintiff should never twist, stoop, bend, crouch, or climb stairs or ladders (R. 267). Dr. Topping also opined that Plaintiff's abilities to reach, handle, finger, feel, push and pull were affected by his impairments in that he was unable to perform this functions "due to increase[ed] & limited mobility"(R. 267-68). He based this opinion on Plaintiff's having "had previous surgery on his knee[without] relief in his symptoms." Dr. Topping found Plaintiff should avoid all exposure to extreme cold, wetness, humidity, and hazards. Dr. Topping noted the environmental restrictions of extreme heart, noise, fumes, odors, dusts, gasses, and poor ventilation were not applicable to Plaintiff. Dr. Topping wrote that the medical finding that supported his opinion that Plaintiff should avoid all exposure to certain environmental factors was Plaintiff had osteoarthritis in Plaintiff's knee, which caused "severe amount of pain. [Plaintiff] is unable to climb." Dr. Topping opined that "work-related activities which are affected by the impairment" were Plaintiff "use[d] a cane as assistive device due to instability in his knee. . . . [was] unable to crawl or kneel due to OA pain, stiffness & swelling." Dr. Topping opined Plaintiff would be absent from work more than three times per month (R. 268).

On November 11, 2005, Plaintiff presented to Dr. Parviz with a complaint of back pain and a request for a refill of his Lortab prescription. Plaintiff's examination was normal, except for tenderness in his lower back. His blood pressure was 152/92. Dr. Parviz diagnosed chronic back pain and instructed Plaintiff to return in two months. He prescribed Lortab (R. 291-92).

On November 17, 2005, Dr. Parviz noted Plaintiff's blood pressure was 120/84. Plaintiff was medicating with Prevacid, Hydrochlorothiazide, Clonidine, Allopurinol, Effexor, Lortab, and Toprol. He listed his past medical history as inclusive of hypertension, gout, renal insufficiency, severe knee osteoarthritis, back pain, which gave him depression, and "DJD lumber spine."

Plaintiff's blood pressure was 120/84 (R. 293). Dr. Parviz's examination of Plaintiff revealed he was afebrile, alert, and in no acute distress. Plaintiff's head, eye, ear, nose, throat, neck, respiratory, heart, gastrointestinal, skin, and musculoskeletal examinations were normal (R. 294). Dr. Parviz opined Plaintiff was "able to do a sedentary job as most of his problems are with is knees" (R. 295).

On February 10, 2006, Plaintiff presented to Dr. Parviz for "follow up on depression and back pain." Plaintiff stated he experienced "excessive day time somnolence and snorting." Plaintiff reported he was "concerned about sleep apnea." Plaintiff reported one testicle was enlarging and the other was becoming smaller. Plaintiff medicated with Prevacid, Hydrochlorothiazide, Clonidine, Allopurinol, Effexor, Lortab, and Toprol. Plaintiff stated his past medical history was positive of hypertension, gout, arthritis, renal insufficiency, severe knee osteoarthritis, back pain, which caused depression, and "DJD lumber spine" (R. 289). Dr. Parviz found Plaintiff to be afebrile, alert, and in no acute distress. Plaintiff demonstrated prolonged expiration of breath. Dr. Parviz diagnosed depression, chronic back and left knee pain, sleep apnea, right testicular swelling, and erectile dysfunction. Plaintiff was referred to a pulmonologist for a sleep study test and instructed to return in two weeks (R. 290).

On February 23, 2006, an ultrasound was made of Plaintiff's right testicle. It showed the presence of a left varicocele[5] and extensive hydrocele[6] on the right (R. 307, 308).

On February 24, 2006, Plaintiff was examined by Dr. Parviz, who found Plaintiff to be alert,

---

[5]Varicocele: a condition in males characterized by varicosity of the veins of the pampiniform plexus, forming a swelling that feels like a "bag of worms"; it appears bluish through the skin of the scrotum and is accompanied by a constant pulling, dragging, or dull pain in the scrotum. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 2008.

[6]Hydrocele: a circumscribed collection of fluid, especially a collection of fluid in the tunica vaginalis testis or along the spermatic cord. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 870.

afebrile and in no distress. Plaintiff's lungs were clear to auscultation (R. 287-88). Plaintiff reported his past medical history was positive for hypertension, gout, arthritis, renal insufficiency, severe knee osteoarthritis, back pain, which caused depression, and "DJD lumbar spine." Plaintiff reported a right testicular hydrocele and a left testicular varicocele. Plaintiff medicated with Prevacid, Hydrochlorothiazide, Clonidine, Allopurinol, Effexor, Lortab, and Toprol. Plaintiff's blood pressure was 120/100 (R. 287). Dr. Parviz assessed right testicular hydrocele and left testicular varicocele. He referred Plaintiff to Dr. Chua for these conditions (R. 288).

On March 5, 2006, Muqdad A. Zuriqat, M.D., a sleep medicine specialist, corresponded with Dr. Parviz about Plaintiff's diagnostic sleep study, which was performed on February 24, 2006. The total recording time of the study was six hours; total sleep hours were 3.3. Plaintiff's sleep efficiency was 54%. Dr. Zuriqat noted no apneas and six hypopneas[7] with a respiratory disturbance rate of 1.8 events per hour of sleep. Plaintiff's oxygen saturation remained within normal limits. Dr. Zuriqat's impression was for excessive daytime sleepiness. The "sleep study ruled out the diagnosis of obstructive sleep apnea." Dr. Zuriqat advised Plaintiff to lose weight and be treated by an ears, nose, and throat physician for his snoring, which was noted to be moderate (R. 302).

On March 13, 2006, Plaintiff presented to Domingo T. Chua, M.D., with a left varicocele. Plaintiff reported the varicocele "bother[ed] him." Dr. Chua diagnosed varicocele and recommended Plaintiff undergo a spermatocelectomy[8] (R. 280).

On March 23, 2006, Plaintiff underwent an ECG, which was normal (R. 314).

---

[7]Hypopnea: abnormal decrease in the depth and rate of breathing. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 897.

[8]Spermatocelectomy: excision of a spermatocele. *Dorland's Illustrated Medical Dictionary*, 30th Ed., 2003, at 1732.

On March 27, 2006, Plaintiff underwent a right spermatocelectomy, which was performed by Dr. Chua. Dr. Chua noted the spermatocele was 6cm. large, which he excised. Plaintiff's testicle and globus major of the epididymis were intact and left intact (R. 298, 309, 310-11, 315-16).

On April 5, 2006, Plaintiff was examined by Dr. Chua after he'd undergone a spermatocelectomy. There was no active bleeding (R. 279).

On April 13, 2006, Dr. Chua noted Plaintiff's spermatocelectomy wound cite was healed and there was minimal indentation (R. 279).

On June 16, 2006, Plaintiff requested prescription refills from P.A. Denise A. Leach. He reported wheezing and a nonproductive cough. Plaintiff reported his symptoms were worse at night. He had no fever and no chest pain (R. 283). P.A. Leach's examination of Plaintiff's eyes, ears, nose, throat, neck, heart, gastrointestinal system, neurological system, and skin showed normal results (R. 283, 285). Plaintiff's respiratory examination showed wheezing in bilateral lungs (R. 285). Plaintiff's medicated with Prevacid, Hydrochlorothiazide, Clonidine, Allopurinol, Effexor, Toprol, and Lortab (R. 283). Plaintiff reported his past medical history included hypertension, gout, arthritis, renal insufficiency, severe knee osteoarthritis, back pain, which caused depression, and "DJD lumbar spine." Plaintiff's blood pressure was 140/100. P.A. Leach found Plaintiff was afebrile, was alert, was in no acute distress, and was well developed and well nourished (R. 284). P.A. Leach diagnosed wheezing, hypertension, and reflux. She refilled Plaintiff's "current" medications and prescribed Albuterol inhaler (R. 285).

On June 30, 2006, Plaintiff presented to Dr. Parviz for follow up examination and pain medication refills. Plaintiff was medicating with Prevacid, Hydrochlorothiazide, Clonidine, Allopurinol, Effexor, Toprol, and Lortab. Plaintiff's past medical history included hypertension,

gout, arthritis, renal insufficiency, severe knee osteoarthritis, back pain, which "gives depression," "DJD lumbar spine," and asthma. Plaintiff listed his past surgeries as left knee high tibial osteotomy in August, 2004. Plaintiff reported having "screws and plats [sic] in the knee." Plaintiff reported he lived in a stable home; he did not use alcohol, but he used smokeless tobacco (R. 281). Plaintiff's blood pressure was 120/88. Dr. Parviz's examination of Plaintiff's eyes, heart, ears, nose, throat, and GI showed normal results (R. 282-83). Dr. Parviz noted Plaintiff's respiratory exam produced "few wheeze [sic] bilaterally" and his back examination produced "lower thoracic and lumbar spine area tenderness." Dr. Parviz diagnosed chronic back pain, "asthma?," and wheezing. He prescribed Lortab (R. 282).

On July 6, 2006, a pulmonary function analysis was completed of Plaintiff (R. 296). It showed "severe obstructive lung defect," based on the FEV1 results. Plaintiff's airway's obstruction was "confirmed by the decrease in flow rate at peak flow and flow at 25%, 50% and 75% of the flow volume curve." It was determined that, due to the poor effort made by Plaintiff, a "more detailed pulmonary function testing may be useful if clinically indicated"(R. 297, 336).

On August 10, 2006, Plaintiff was examined by Dr. Parviz. Dr. Parviz noted Plaintiff's "CXR was normal and Alpha-1 Antrypsin level was normal." Plaintiff's "sweat chloride test was within normal limits." Plaintiff reported his breathing had improved after use of Advair. Plaintiff listed his medications as Prevacid, Hydrochlorothiazide, Clonidine, Allopurinol, Effexor, Toprol, Lortab, Albuterol, and Advair. Plaintiff listed his past medical history to include hypertension, gout, arthritis, renal insufficiency, severe knee osteoarthritis, back pain, which caused depression, degenerative joint disease, and asthma. Plaintiff reported using smokeless tobacco. He "reside[d] in a stable nuclear family" (R. 327). Dr. Parviz's examination of Plaintiff's eyes and cardiac system

revealed normal results. Dr. Parviz found Plaintiff breathed without effort. His expiration was prolonged with few rhonchi. Dr. Parviz opined Plaintiff's asthma had improved. Dr. Parviz also noted Plaintiff "was negative for opiates, non-compliance. Based on narcotic contract will advice [sic] patient to find someone else take care of his back pain." Dr. Parviz prescribed Advair and Lortab (R. 328).

On September 3, 2006, Dr. Topping completed an Attending Physician's Statement, wherein he opined Plaintiff had been permanently disabled from July 21, 2004 and would be "to 12-31-06," due to "genu varum L knee" and degenerative joint disease of his knee. Dr. Topping opined Plaintiff could "never" return to work. Dr. Topping noted he had treated Plaintiff once, on January 5, 2006, since he had filed his last report (R. 325).

<u>Evidence Received at the Administrative Hearing</u>

On August 16, 2006, Jaroslaw S. Pondo, M.D., opined, at his initial evaluation of Plaintiff that his PFT showed severe obstructive pattern with excellent response to bronchiodilators. Dr. Pondo assessed asthma/bronchitis, prescribed Advair, and started Plaintiff on nebulizer therapy (R. 326, 344).

<u>Evidence Received Subsequent to the Administrative Hearing</u>

On July 27, 2006, Plaintiff's blood work revealed he was negative for opiates (R. 335).

On July 28, 2006, Plaintiff had a chest x-ray made. The reason for the examination was COPD and wheezing. The x-ray was negative (R. 332, 333).

On July 28, 2006, Plaintiff had a Alpha-1-Antitrypain Phenotyp test completed; the results were normal (R. 334).

On July 31, 2006, Plaintiff was tested for cystic fibrosis; the test was negative (R. 331).

On September 12, 2006, Plaintiff reported to Dr. Parviz with complaints of back pain and left hip pain. Plaintiff reported medicating with Prevacid, Hydrochlorothiazide, Clonidine, Allopurinol, Effexor, Toprol, Lortab, Advair, and Albuterol. Plaintiff reported his past medical history was unchanged from his August 20, 2006, report (R. 329). Dr. Parviz noted Plaintiff was afebrile, alert, was in no acute distress, well developed, and well nourished. Plaintiff breathed without effort, his lungs were clear to auscultation, bilaterally, and his expiration was prolonged. Plaintiff was positive for bilateral leg edema. There was tenderness in his lower lumbar area. His strength was 4/5 in his left lower extremity. Plaintiff's straight-leg raising test was negative for radiculopathy. Dr. Parviz diagnosed asthma, chronic back pain, hypertension, and bilateral leg edema. Dr. Parviz ordered a lipid profile and prescribed Lasix for treatment of fluid retention and Naprosyn for treatment for back pain (R. 330).

On September 13, 2006, Dr. Pondo examined Plaintiff for asthma. He found Plaintiff had no chest pain and no hemoptysis. Dr. Pondo's review of Plaintiff's systems revealed supple neck, no JVD, no bruit, chest clear to auscultation, no extremity clubbing or edema, and intact neuro cranial nerves. Dr. Pondo assessed Plaintiff's asthma as clinically improving. Plaintiff's FEV1 had improved from 16% to 56%; his asthma was assessed as being moderate and persistent. Dr. Pondo increased Plaintiff's dosage of Advair (R. 342, 343).

In an undated Pulmonary Residual Functional Capacity Questionnaire, Dr. Pondo noted he had been treating Plaintiff for six to eight weeks for asthma. Plaintiff's symptoms included shortness of breath, orthopnea, chest tightness, wheezing, episodic acute asthma, episodic acute bronchitis, fatigue, palpations, and coughing. Dr. Pondo opined the precipitating factors for Plaintiff's symptoms included upper respiratory infection, allergens, exercise, emotional upset/stress, irritants,

cold air, and change in weather. Dr. Pondo noted Plaintiff's attacks were moderate to severe (R. 338). Dr. Pondo found Plaintiff had asthma attacks once or twice yearly, during which he was incapacitated for one to two weeks. Plaintiff was not a malingerer and emotional factors did not contribute to his asthma symptoms, according to the findings of Dr. Pondo. Dr. Pondo found Plaintiff's impairments were reasonably consistent with his symptoms. He opined Plaintiff's pain or other symptoms were severe enough to frequently interfere with his attention and concentration. Dr. Pondo found Plaintiff was capable of low stress jobs. Dr. Pondo found Plaintiff had no side effects to his medications that would impede his working. Dr. Pondo opined Plaintiff's prognosis was fair. Dr. Pondo found Plaintiff's impairments were not expected to last for at least twelve months (R. 339).

Dr. Pondo opined Plaintiff could walk for one or two city blocks without resting and without severe pain. Dr. Pondo found Plaintiff could sit for fifteen minutes at one time before having to "get up." He found Plaintiff could stand for fifteen minutes at one time before he had to sit down or walk around. Dr. Pondo found Plaintiff could sit, stand, and/or walk for a total of less than two hours in an eight-hour workday. Dr. Pondo found Plaintiff could never lift any amount of weight "in a competitive work situation." Dr. Pondo found Plaintiff could never twist, stoop, crouch, squat, climb ladders or climb stairs (R. 339-40). Dr. Pondo found Plaintiff should avoid all exposure to extreme cold, extreme heat, high humidity, wetness, and dust. Dr. Pondo found Plaintiff should avoid even moderate exposure to perfumes, soldering fluxes, solvents, cleaners, fumes, odors, gasses, and chemicals. Dr. Pondo made no finding as to whether Plaintiff's impairments would cause good days or bad days or cause him to be absent from work (R. 341).

Plaintiff testified at the September 20, 2006, administrative hearing that his left knee was the "main problem affecting [his] ability to work." Plaintiff stated he experienced back pain in addition to his knee pain (R. 369). Plaintiff stated he'd undergone an osteotomy procedure on his left knee but that "everything [was] still the same as it was" before the surgery (R. 370). Plaintiff testified that walking made his knee pain worse (R. 371). Plaintiff described his knee, hip, and back pain as constant (R. 371-72). Plaintiff reported that his pain was relieved by lying down and elevating his legs (R. 372). Plaintiff testified his COPD/asthma caused him to cough and wheeze, which caused him to be lightheaded (R. 375). Plaintiff stated his depression caused him to not "like going around people." He testified he felt he was "a nuisance to people." Plaintiff stated he had nothing in common with others and he "like[d] being by [him]self more or less." Plaintiff stated he had not received any therapy for his depression and that his physician had not recommended therapy for depression. Plaintiff testified he had had a hydrocele removed (R. 378). Plaintiff testified he had back pain, which was caused by degenerative joint disease (R. 379). The ALJ noted the May, 2005, MRI showed minimal disc degeneration with some facet joint hypertrophy, but no herniation stenosis or impingement. The ALJ also noted Plaintiff's lab test showed he was negative for peripheral vascular disease (R. 379).

Plaintiff testified he could walk thirty yards, with a cane, without stopping. Plaintiff stated he placed most of his weight on his right leg when he was standing (R. 370). Plaintiff testified his knee "locked up" and that he had fallen a few times (R. 387). Plaintiff testified he could stand for five or ten minutes before he had to sit and could sit for ten to fifteen minutes before he had to walk, move, stand, or stretch. Plaintiff stated he could lift five to ten pounds (R. 371). Plaintiff stated

his asthma attacks were unpredictable (R. 377). Plaintiff reported symptoms of his depression included his awaking at night "crying with pain" and crying when he saw something on television that reminded him of his condition (R. 385). Plaintiff testified he had not informed his physicians of his "crying spells" because he did not "like talking about it." Plaintiff reported he awoke "about every hour and one half to two hours; he stated he was able to get about three hours of sleep per night. Plaintiff testified that he sometimes fell asleep during the day (R. 386).

Plaintiff testified he medicated his knee pain with Naproxin (R. 372). Plaintiff stated Naproxin reduced his knee swelling and lessened the grinding within his knee (R. 373). Plaintiff reported his blood pressure was controlled on "some days and some days not" with medication; his hypertension caused headaches, which occurred "a couple times a week" (R. 373-74). Plaintiff treated his asthma with an Albuterol inhaler, which he used four or five times per day, and an Albuterol nebulizer, which he used four times per day (R. 375). Plaintiff stated he medicated with the nebulizer when he arose in the morning and when he retired at night and then "about every six hours." Plaintiff testified he used the nebulizer for ten minutes at a time and that it "helped" his asthma symptoms in that the medication "open[ed] [his] airways, and [took] all of [his] wheezing and stuff away at the time" (R. 376). Plaintiff testified he treated his depression with Effexor and he treated his "acid stomach" with Prevacid (R. 377). Plaintiff stated he treated his back pain with pain medication (R. 379). Plaintiff reported he had discussed knee replacement surgery with Dr. Topping; that Dr. Topping advised him that he was a candidate for only one knee replacement; and that Dr. Topping had told him the replaced knee would be functional for eight to fifteen years (R. 388). Plaintiff testified he would consider a knee replacement sometime in the future (R. 389).

Plaintiff testified he occasionally drove ten minutes to visit his parents. He stated he heated

food out of a can or prepared boxed meals. Plaintiff testified his girlfriend cleaned twice per week for him and cooked for him "some" (R. 382). Plaintiff testified he had not hunted or fished for about two years as he could not "get up and down hills" and could not "walk too good on unlevel ground." Plaintiff stated he grocery shopped once per month; he rode in an electronic cart when he shopped (R. 383). Plaintiff testified he did not go to movies, church, or restaurants. He stated he did visit his girlfriend "a couple of times a week" at her home. Plaintiff stated, in addition to his girlfriend's visiting him, his parents and a friend visited him. Plaintiff stated he did not watch much television as he could not sit long enough to watch an entire movie. Plaintiff did not read (R. 384). Plaintiff stated he did not exercise due to pain (R. 385).

The ALJ asked the following hypothetical to the VE:

> Let's assume a person of the same age, education, and work experience as the claimant. But the claimant is going to have a hybrid kind of maximum work. He is basically limited to sedentary type work but he would be able to lift a little more than sedentary. So he would be able to do light work as that is defined per the lifting requirements, but he would be limited to no standing or walking more than two hours a day total, and no standing or walking more than about 10 minutes straight. The person should be able to use a cane when standing or walking in one hand, and there would be no climbing ladders, ropes, scaffolds, stairs, or ramps, no more than occasional. And no kneeling, crouching, or crawling, and no more than occasional balance or stoop, and there would be no exposure to extreme heat or cold or vibrations. . . . And no exposure to more than moderate levels of fumes, dust, and gases, or other respiratory irritants. No exposure to significant workplace hazards like heights or dangerous moving machinery. The jobs should involve no detained or complex instructions. No close concentration or attention to detail for extended period. No work with the general public. Would there be any jobs such a person could do at the sedentary level? (R. 391- 92).

The VE responded:

> Yes. At the sedentary level, Your Honor, that hypothetical individual, I believe, could function as a general office clerk sedentary. There are 299,000 nationally and 2,900 regionally. Or as a machine tender. There are 141,000 nationally and 1,400 regionally. Also as a general sorter. There are 25,000 nationally and 650 regionally (R. 392).

The ALJ asked the following: ". . . [Y]ou don't see any light work that would fit?" (R. 392).

The VE responded that "[t]he light work with that limitation with having to use the cane while standing is, I'm more comfortable keeping it at sedentary with that" (R. 393).

The ALJ then asked: "How many days, if any, can a person miss work and still do these kinds of jobs?" (R. 393).

The VE responded that "[i]f a person is going to miss more than two days per month, I believe the supervisory personnel would attempt to have a correction of that behavior, and if not corrected would result in termination" (R. 393).

The ALJ asked: "Now would a person be able to change positions from sitting to standing per just a minute or two at least every half hour, an [sic] still be able to do these kinds of jobs?" The VE responded in the affirmative (R. 393).

Plaintiff's counsel asked the VE the following question: "[T]here has been an RFC completed by a Dr. Topping . . . which indicates . . . that [Plaintiff] should do no lifting at all on the job. Would these jobs that you have talked about still be available if a no lifting restriction was added to the Judge's hypothetical?" The VE responded in the negative (R. 393).

Counsel asked the following: "That same RFC indicates that [Plaintiff] would miss more than three days per month, and you testimony is that he would not be qualified for any of these jobs if he missed more than three days per month?" The VE responded that "would not allow for a competitive work routine" (R. 394).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ McDougall made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since July 21, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and r416.971 *et seq.*).

3. The claimant has the following severe impairments: severe left knee degeneration with history of surgeries, hypertension; asthma/chronic obstructive pulmonary disease; degenerative joint disease of the lumbar spine; gastroesophageal reflux disease (controlled); obesity; and depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of sedentary work. He must not stand or walk for more than a total of two hours in an eight hour workday and for no more than ten minutes at any one time. He must be allowed to briefly (one to two minutes) change position every thirty minutes. He must perform no climbing of ladders, ropes, scaffolds, stairs or ramps, kneeling, crouching or crawling, and no more than occasional balancing or stooping. He must avoid exposure to extremes or heat, cold, workplace vibrations, and significant workplace hazards such as heights or dangerous moving machinery. He may not have exposure to more than moderate levels of fumes, dusts, gases or other respiratory irritants. The work must not require detailed or complex instructions, close concentration or attention to detail for extended periods, or work with the general public. He must have an allowance for missing up to one day of work per month due to his impairments.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 30, 1962 and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicated in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the

claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.     The claimant has not bee under a "disability," as defined in the Social Security Act, form July 21, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) (R. 22-32).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1. The Commissioner erred as a matter of law by discounting the Plaintiff's credibility without providing specific reasons supported by the evidence in the case record (Plaintiff's brief at p. 7).

2. The Commissioner erred as a matter of law by finding that the Plaintiff is capable of work that exists in substantial numbers in the national economy (Plaintiff's brief at p. 10).

3. The Commissioner erred as a matter of law by failing to consider the additional evidence regarding the Plaintiff's mental health (Plaintiff's brief at p. 13).

The Commissioner contends:

1. Substantial evidence supported the ALJ's finding that Plaintiff's allegations of intense, persistent, and debilitating symptoms were not entirely credible (Defendant's brief at p. 10).

2. Substantial evidence supported that Plaintiff was capable of performing a limited range of sedentary work such as the more than 450,000 examples of jobs which were cited to by the vocational expert (Defendant's brief at p. 13).

3. There is no relevant mental health evidence that warrants a remand (Defendant's brief at p. 14).

## C. Credibility

Plaintiff contends that the Commissioner erred by discounting the Plaintiff's credibility without providing specific reasons which were supported by the evidence in the case record. Plaintiff argues the ALJ's decision "shows that insufficient reasoning is provided for the unfavorable credibility assessment" and does not confirm with Social Security Ruling 96-7p (Plaintiff's brief at p. 7). Plaintiff asserts the "ALJ . . . failed to provide such specific cogent reasons" to support his decision as to Plaintiff's credibility (Plaintiff's brief at p. 8). Defendant contends that substantial evidence supported the ALJ's findings that Plaintiff's allegations of intense, persistent, and debilitating symptoms were not entirely credible.

SSR 96-7p provides, in part, the following:

PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:

> 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

> 2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

> . . .

> 4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

> 5. It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for

the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

In this case, the ALJ did not make a "single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" The ALJ's "determination or decision . . . contain[ed] specific reasons for the finding on credibility, supported by the evidence in the case record . . . ." In his decision, the ALJ considered, in conformance with SSR 96-7p, the objective medical evidenced, Plaintiff's own statements about his symptoms, and statements and other information provided by treating or examining physicians or psychologists in his credibility analysis of Plaintiff. Additionally, the ALJ did not disregard Plaintiff's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms had on his ability to work because they were not substantiated by objective medical evidence.

In his decision, the ALJ found the following: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (R. 27).

Had the above been the extent of the ALJ's credibility assessment of Plaintiff, then his determination as to Plaintiff's credibility would have been suspect; however, the ALJ's assessment did not end with this statement. The ALJ evaluated and examined the objective medical evidence of record as to Plaintiff's symptoms in making his credibility determination. The ALJ noted that Plaintiff's left knee range of motion lacked seven degrees of extension to flexing 130 degrees on

March 15, 1999 (R. 27). The ALJ evaluated Dr. Topping's October 20, 2005, assessment of Plaintiff's x-ray of his knee, which showed no diaphyseal or distal metaphyseal abnormality (R. 27). Relative to Plaintiff's back pain, the ALJ also considered a May 5, 2005, MRI of Plaintiff's thoracic spine, which was negative, and a MRI of Plaintiff's lumbar spine, which "showed minimal disc degeneration at L3-4 and L4-5 with some facet joint hypertrophy at L4-5 bilaterally but no frank disc herniation, spinal stenosis, or direct neural impingement" (R. 28). The ALJ considered that Plaintiff's September 12, 2006, straight leg raising test, which was negative for radiculopathy. Relative to Plaintiff's sleepiness, the ALJ evaluated the results of Plaintiff's February 24, 2006, sleep study, which showed excessive daytime sleepiness, but no obstructive sleep apnea (R. 28). In evaluating Plaintiff's credibility as to his complaints of breathing difficulties, the ALJ considered Plaintiff's July 6, 2006, pulmonary function test, which "showed severe obstructive lung defect, based on FEV1, but a good response to a bronchodilator." Plaintiff's chest x-rays, made on June 16, 2004, and July 28, 2006, were negative; the ALJ considered both of these tests (R. 24, 29). The ALJ noted Plaintiff's July 14, 2005, kidney ultrasound showed "only a small probable cyst but no gross abnormality" and his July 7, 2005, peripheral vascular examination showed "no evidence of arterial obstruction" (R. 23). The ALJ relied on these various pieces of objective medical evidence to find that Plaintiff's complaints of pain were not entirely credible.

The ALJ also considered, evaluated, and weighed the opinions of treating and other physicians in making his credibility determination as to Plaintiff. Specifically, the ALJ assessed the opinions of Dr. Topping, relative to Plaintiff' knee condition; Dr. Parviz, relative to Plaintiff's back pain, leg pain, breathing condition, depression; and Dr. Pondo, relative to his pulmonary function.

The ALJ noted that Dr. Topping found, in September, 1998, that Plaintiff had a four percent

permanent partial impairment due to his knee sprain. The ALJ evaluated Dr. Topping's April 11, 2005, observation that Plaintiff's knee, post surgery, still caused pain when he walked, but not when he was sitting, and that Plaintiff could not return to work that required walking, but could perform sedentary work (R. 27). The ALJ found this opinion "reasonable and consistent with the medical evidence of record" (R. 31). The ALJ also considered Dr. Topping's October 20, 2005, opinion as to Plaintiff's limitations, which included no lifting, standing or walking and no sitting for extended periods of time; the ALJ noted Dr. Topping had "made no new findings that would support this change from his previous opinion that the claimant could do sedentary work." The ALJ then noted that Dr. Topping opined, on August 30 [sic], 2006, that Plaintiff could never return to work and was totally and permanently disabled (R. 28). This last opinion was rejected by the ALJ; he found it was contrary to previous opinions expressed by Dr. Topping. As to the October 20, 2005, and August 30, 2006, opinions of Dr. Topping, the ALJ opined it was "unclear" to him "why a problem in one knee would have the large number of restrictions in various parts of the body seemingly unrelated to the knee" (R. 30).

The ALJ considered and evaluated the opinions of Dr. Parviz, Plaintiff's treating physician, relative to various complaints, conditions, and impairments. The ALJ reviewed and considered Dr. Parviz's November 16, 2005, opinion that Plaintiff was capable of sedentary work, which he found "reasonable and consistent with the medical evidence of record" (R. 28, 31); September 7, 2005, opinion that Plaintiff had degenerative joint disease of the lumbar spine; Dr. Parviz's August 10, 2006, instruction to Plaintiff that he seek other medical treatment from another source for his back pain because Plaintiff was not compliant with his medications; Dr. Parviz's September 12, 2006, opinion that, despite Plaintiff's complaints of back pain at level ten, he was in "no acute distress,

well developed, well nourished, and attentive to grooming"; Dr. Parviz's June 16, 2006, treatment of Plaintiff's wheezing with an inhaler, which resulted in improved breathing; and Dr. Parviz's September 12, 2006, opinion that Plaintiff breathed "without effort and his lungs were clear to auscultation, bilaterally" (R. 28-29).

The ALJ also considered and evaluated the August 16, 2006, opinions of Dr. Pondo, Plaintiff's pulmonary specialist, that Plaintiff had asthma and bronchitis, which were treated with a nebulizer and an increase in his medications, He considered Dr. Pondo's September 12, 2006, opinion that Plaintiff "breathed without effort and his lungs were clear to auscultation, bilaterally." The ALJ considered Dr. Pondo's September 13, 2006, opinion that Plaintiff's asthma was improving clinically and that he was capable of low stress jobs. The ALJ also noted the various exertional and environmental limitations assigned to Plaintiff by Dr. Pondo and concluded Dr. Pondo's opinion as to those limitations was "way too extreme" for him to make because Plaintiff had only had two visits with the specialist (R. 29). Accordingly, the ALJ did not give this opinion controlling weight (R. 30-31).

The record of evidence details the attention, consideration, and weight the ALJ assigned to each of the opinions of those doctors who examined and/or treated Plaintiff. The ALJ's credibility determination, based on the opinions of Plaintiff's treating/examining physicians, was not based on an "intangible or intuitive notion" and void of "cogent reasons" (Plaintiff's brief at p. 8) as alleged by Plaintiff; it is based on the ALJ's evaluation of the objective medical and opinion evidence and supported by that evidence.

In addition to the ALJ's analysis of the objective medial evidence and the opinions of Plaintiff's treating physicians, the ALJ fully examined Plaintiff's own statements of his symptoms and considered them in his determination. The ALJ considered Plaintiff's testimony at the

Administrative Hearing that he was unable to work due to pain in his knee (R. 26). The ALJ found this testimony inconsistent with the opinions of Drs. Topping and Parviz, who found, at various times during their treatments of him, that Plaintiff could perform sedentary work (29). The ALJ also considered Plaintiff's testimony that he walked with a cane, could walk for thirty yards, could stand for five to ten minutes with his weight on his right leg, could sit for ten to fifteen minutes, and could lift five to ten pounds and accommodated those limitations in his RFC, which included Plaintiff's not standing or walking for more than a total of two hours in an eight-hour workday and for no more than ten minutes at one time; having to change positions to relieve his pain; not being required to climb ladders, ropes, scaffolds, stairs or ramps; not being required to kneel, crouch, or crawl; not being required to more than occasionally balance or stoop; and not being required to work in a workplace that contains vibrations and hazards, such as heights or dangerous moving machinery (R. 26, 29). The ALJ considered Plaintiff's testimony that he'd been diagnosed with asthma and COPD and that he medicated those conditions with an inhaler (R. 26-27). The ALJ noted Plaintiff's pulmonary specialist opined Plaintiff's breathed without effort, was improving clinically, and was capable of low stress jobs (R. 29). The ALJ found Plaintiff's asthma had "shown improvement after treatment and [had] been accommodated by the requirement that [Plaintiff] avoid extremes of heat and cold and exposure to more than moderate levels of fumes, dusts, gases or other respiratory irritants" (R. 29).

The ALJ also considered Plaintiff's testimony that he had "crying spells and would wake up in the night crying with pain or would cry while watching television" and had not informed his physician about these symptoms (R. 27). The ALJ delivered a thorough evaluation of Plaintiff's mental functioning in his decision (R. 24-26). The ALJ limited Plaintiff to work that did "not

require detailed or complex instructions, close concentration or attention to detail for extended periods, or work with the general public" (R. 30). The ALJ did not, as asserted by Plaintiff, "arbitrarily discount [Plaintiff's] credibility," but, instead, the ALJ thoroughly considered Plaintiff's statements, weighed them with the evidence of record, and accommodated those limitations supported by the record within his RFC.

Finally, Plaintiff asserts that the ALJ's comment that Plaintiff's "work history [is] an indication of some other motivation for his present unemployment other than medical impairments" is "an outrageous allegation" (Plaintiff's brief at p. 9). In his decision, the ALJ noted that, based on a review of the Plaintiff's work history, it appeared that Plaintiff had "a good work record in the last ten or eleven years, he worked only sporadically prior to that, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments." In conjunction with his statement about Plaintiff's work history, the ALJ noted that Plaintiff had "not generally received the type of medical treatment one would expect for a totally disabled individual. The claimant has had surgical treatment in the past for his knee condition but not much recent treatment or medication. The undersigned finds that this condition should not prevent limited sedentary work" (R. 30). A review of the entire decision shows the ALJ did not base his credibility determination on his speculation of Plaintiff's motives for not working; he based them on the objective medical evidence, the opinions of treating/examining physicians, and the testimony of Plaintiff as outlined and discussed herein. The ALJ's comments about Plaintiff's work history and his motivation to work are harmless.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The undersigned finds substantial evidence supports the ALJ's determination regarding the credibility of Plaintiff's complaints of pain and other functional limitations.

## D. Opinion Evidence and Hypothetical to VE

Plaintiff contends the ALJ erred as a matter of law by finding that the Plaintiff was capable of work that exists in substantial numbers in the national economy. Plaintiff argues that "the ALJ proposed a series of hypothetical questions to the vocational expert to determine if there were a significant number of jobs in the national economy which the claimant could perform with restrictions identified by the judge. . . ." but that the "ALJ failed to adequately include the limitations presented by [Plaintiff's] impairments in the hypotheticals to the VE" . . . "[i]n large part due to his failure to give appropriate weight to the medical evidence and to the opinions of two of [Plaintiff's] physicians" (Plaintiff's brief at p. 11). Defendant contends that substantial evidence supported that Plaintiff was capable of performing a limited range of sedentary work such as the more than 450,000 examples of jobs which were cited to by the vocational expert.

Plaintiff asserts that Fourth Circuit case law requires that the VE's opinion "must be based upon a consideration of all the evidence in the record and 'fairly set out all of the claimant's impairments.'" *Walker v. Bowen*, 889 F.2d 47, 50 (1989); *Hicks v. Califano*, 600 F.2d 1048 (1979) (Plaintiff's brief at p.10). Plaintiff contends that a "hypothetical that does not reflect all of the claimant's limitations effectively creates a situation where the VE's testimony is devoid of an evidentiary value to support a finding that the claimant can perform jobs in the national economy. *Swaim v. Califano* 599 F.2d 1309 (4th Cir. 1979); *Cornett v. Califano*, 590 F.2d 91 (4th Cir. 1978)" (Plaintiff's brief at p. 10). Plaintiff argues the ALJ did not consider all the evidence of record and

his hypothetical question did not include all of Plaintiff's limitations because the ALJ "completely disregarded the opinion of two of [Plaintiff's] treating physicians" [Drs. Topping and Pondo]; specifically, that the ALJ "completely discounted" the October 20, 2005, opinion of Dr. Topping that Plaintiff could "perform no lifting [sic] standing or walking, was unable to sit or stand for extended periods, could perform no twisting, stooping, crouching or climbing of stairs, and would be absent from work three or more days each month"; "completely discounted" the August 30, 2006, opinion of Dr. Topping that Plaintiff was "totally and permanently disabled and could never return to work"; and "disregarded" the September 3, 2006, opinion of Dr. Pondo that Plaintiff could do "absolutely no lifting" (Plaintiff's brief at pp. 11-12).

The Fourth Circuit has determined what weight should be given to the opinions of a treating physician. In *Craig v. Chater*, 76 F.3d 585, 590 (1996), the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

The October 20, 2005, opinion by Dr. Topping is found in his Medical Opinion Re: Ability to do Work-Related Activities (Physical). He found Plaintiff could not lift or carry any weight on an occasional or frequent basis; could not stand or walk for any period during an eight-hour workday; was "unable to sit for extended period of time"; could neither sit nor stand for any length of time

before changing positions; did not need to "walk around, but needed to walk for five minutes when he "walked around"; needed to shift at will from sitting or standing/walking; needed to lie down at "unpredictable intervals during a work shift"; but he noted it was "unknown" as to how often Plaintiff would have to lie down; should never twist, stoop, bend, crouch, or climb stairs or ladders; should not reach, handle, finger, feel, push and pull; should avoid all exposure to extreme cold, wetness, humidity, and hazards; and was unable to crawl or kneel. He found Plaintiff would be absent from work more than three times per month (R. 266-688).

In addition to the October 20, 2005, opinion, Dr. Topping completed an Attending Physician's Statement on September 3, 2006, wherein he opined Plaintiff was totally and permanently disabled and could "never" return to work (R. 28, 325). Relative to the September 3, 2006, opinion of Dr. Topping, the undersigned finds that is an opinion reserved to the Commissioner. SSR 96-5p holds the following: "Medical sources often offer opinions about whether an individual who has applied for . . . disability benefits is 'disabled' or 'unable to work,' or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner."

The ALJ found the following as to Dr. Topping's opinions:

As for the opinion evidence, on October 20, 2005, the orthopedic surgeon completed a medical opinion regarding the ability to do work-related activities. He felt that the claimant could perform no lifting, standing or walking during an eight hour day, was unable to sit for extended periods of time, could perform no twisting, stooping, crouching, or climbing of stairs or ladders, was unable to perform reaching, handling, fingering, feeling, or pushing/pulling, should avoid all exposure to extreme cold, wetness, humidity, and workplace hazards, would need to use a cane as an assistive device due to instability in his knee, and would be absent more than three times a

month (Exhibit 6F) (30). . . . The undersigned notes that the surgeon made no new findings that would support this change from his previous opinion that the claimant could do sedentary work (R. 28). . . . On November 16, 2005, the claimant's primary care physician also expressed the opinion that the claimant might be able to do sedentary job because most of his problems were with his knees (Exhibit 10F). However, on August 30 [sic], 2006, the orthopedic surgeon completed another statement that the claimant was totally and permanently disabled and could never return to work (Exhibit 13F) (R. 28). . . . . The undersigned notes that these opinions contradict the surgeon's statement on April 11, 2005, that the claimant could perform sedentary work. Moreover, it is by no means clear why a problem in one knee should have the large number of restrictions in various parts of the body seemingly unrelated to the knee (R. 30).

The undersigned finds that controlling weight (Social Security Ruling 96-2p) cannot be given to th[is] treating physician['s] opinions on the ultimate opinion reserved to the Commissioner (Social Security Ruling 96-5p) because [it is] not warranted by the overall medical evidence of record (R. 31).

In his RFC, the ALJ included some of the limitations found by Dr. Topping. He found Plaintiff capable of work that did not include climbing, crouching, or kneeling and occasional balancing and stooping. The ALJ found Plaintiff needed to change positions to relieve his pain. The ALJ found Plaintiff could not stand or walk for more than a total of two hours per eight-hour work day. As noted by the ALJ, the October 20, 2005, and September 6, 2006, opinions of Dr. Topping as to Plaintiff's limitations, specifically his lifting limitations and requirement that he be absent from work for three or more days per month, are not supported by medical evidence; they are inconsistent with other substantial evidence in the record.

Plaintiff's May 1, 2005, thoracic spine MRI was negative. Plaintiff's May 1, 2005, lumbar MRI showed minimal disc degeneration at L3-4 and L4-5 and "some facet joint hypertrophy and L4-5 bilaterally," but no "frank disc herniation, spinal stenosis or direct neural impingement" (R. 28). Dr. Topping opined, on October 20, 2005, that Plaintiff's x-ray of his left leg showed no diaphyseal or distal metaphyseal abnormality (R. 27). Plaintiff's straight leg raising test was negative for

radiculopathy on September 12, 2006 (R. 28). Plaintiff's lower extremity strength was listed as 5/5 on June 16, 2004, and 4/5 on September 12, 2006 (R. 182, 33). These records of medical evidence were considered and evaluated by the ALJ and support his RFC.

Additionally, Dr. Topping's finding that Plaintiff could not lift and would be absent from work for three days per month is inconsistent with the record of evidence.

Dr. Rahman, who was Plaintiff's treating physician from March , 2002, through June, 2005, did not limit Plaintiff's lifting and did not opine Plaintiff would be absent from work for any significant periods of time. To the contrary, Dr. Rahman found Plaintiff did not have reduced motor strength or deficient neurological sensory abilities on June 16, 2004 (R. 182). On June 23, 2004, June 25, 2004, January 26, 2005, February 19, 2005, February 24, 2005, and May 25, 2005, Dr. Rahman found Plaintiff experienced no weakness and no lack of energy (R. 173-74, 177, 227, 230, 232, 233, 234, 236).

On June 21, 2005, it was noted, in the records of Plaintiff's treatment at the emergency department of David Memorial Hospital, that Plaintiff's sensation and motor strength were intact (R. 168). On October 20, 2005, P.A. Johns, who was affiliated with Dr. Topping, diagnosed Plaintiff with a left tibia contusion and instructed Plaintiff to "continue with activities as tolerated." She did not limit Plaintiff's lifting or ability to work without missed days (R. 227).

Dr. Parviz, who was Plaintiff's treating physician from September, 2005, through the date of the Administration Hearing, did not limit Plaintiff's ability to lift and did not opine that Plaintiff would be absent from work for three or more days per month. On September 27, 2005, Dr. Parviz opined Plaintiff was in no acute distress and was alert; Plaintiff reported the pain medication was reducing his pain (R. 28, 218). Dr. Parviz's November 11, 2005, examination of Plaintiff was

normal, except for tenderness in his lower back (R. 291-92). On November 17, 2005; February 19 and 24, 2006; and September 12, 2006, Dr. Parviz found Plaintiff was afebrile, alert, and was in no acute distress. He opined Plaintiff was capable of performing "sedentary job(s) as most of his problems are with his knees" on November 17, 2005 (R. 28, 287, 290, 330)

Dr. Topping's opinion that Plaintiff could not lift and would be absent from work three days per month is inconsistent with the opinion of Dr. Franyutti, the state-agency physician who filed a Physical Residual Functional Capacity Assessment of Plaintiff on January 17, 2005. He found Plaintiff could occasionally and frequently lift and/or carry ten pounds. Dr. Franyutti agreed with Dr. Topping's "November 29, 2004" opinion that Plaintiff could return to sedentary work(R. 31). Dr. Topping's opinion was also inconsistent with Plaintiff's testimony at the Administrative Hearing. Plaintiff stated he could lift five to ten pounds (R. 371).

Finally, Dr. Topping's opinion that Plaintiff could not lift and would be absent from work three days per month is inconsistent with his own opinion as to Plaintiff's ability. Dr. Topping, after Plaintiff's August 4, 2004, high tibial osteotomy, treated Plaintiff on January 6, 2005, and April 11, 2005 (148, 149). A physician's assistant at Dr. Topping's office evaluated Plaintiff for a left tibia contusion on October 20, 2005 (R. 277-78). Dr. Topping completed medical opinion forms of Plaintiff on October 20, 2005, and September 3, 2006 (R. 266-68, 325). On April 11, 2005, Dr. Topping noted Plaintiff did not have pain when he sat but had pain when he walked. There was no varus or valgus instability. He found Plaintiff would "unlikely to be able to return to any work which would require standing, walking for anything more than a minimal amount of time" and opined Plaintiff was capable of sedentary work (R. 30, 148). As noted above, Dr. Topping opined, on October 20, 2005, at the time Plaintiff was diagnosed with a left tibia contusion by a physician's

assistant on Dr. Topping's staff, that Plaintiff's x-ray showed no diaphyseal or distal metaphyseal abnormality (R. 27, 278). In his decision, the ALJ noted that, from Dr. Topping's April 11, 2005, examination of Plaintiff and the resulting opinion that Plaintiff could perform sedentary work, to his October 20, 2005, and September 3, 2006, opinions that Plaintiff could not lift and would be absent from work for up to three days per month, Dr. Topping had "made no new findings that would support this change from his previous opinion that the claimant could do sedentary work" (R. 28). The undersigned agrees. The medical evidence of record supports the ALJ's RFC finding that Plaintiff can perform sedentary work, with the limitations assigned by the ALJ; Dr. Topping's opinion as to Plaintiff's limitations are not supported by objective medical evidence and are contrary to the evidence of record.

In an undated Pulmonary Residual Functional Capacity Questionnaire, Dr. Pondo, found, in addition to other limitations, that Plaintiff was capable of low stress jobs, but could never lift any amount of weight "in a competitive work situation" (R. 29, 339-40). Relative to this opinion, the ALJ found the following:

> The claimant saw a pulmonary specialist on August 16, 2006. The specialist diagnosed the claimant with asthma and bronchitis, increased his medication and started nebulizer therapy (Exhibit 14F). On September 12, 2006, the primary care physician reported that the claimant breathed without effort and his lungs were clear to auscultation bilaterally (Exhibit 15F). The pulmonary specialist reported on September 13, 2006, that although the claimant's asthma was moderated [sic] and persistent, it was improving clinically. The specialist completed a pulmonary residual functional capacity questionnaire stating that the claimant was capable of low stress jobs. He found that the claimant could sit for fifteen minutes before needing to get up, stand for fifteen minutes before needing to sit down or walk, and sit, stand, and walk for a total of less than two hours in an eight hour workday. The specialist also found that the claimant should never lift, twist, stop [sic], crouch, squat, or climb ladders or stairs, and should avoid all exposure to extreme cold and heat, high humidity, wetness, cigarette smoke and dust and should avoid even moderate exposure to perfumes, soldering fluxes, solvents, cleaners, fumes, odors, gases and chemicals (Exhibit 16F). This seems way too extreme an opinion, given

after only a second visit to the doctor (R. 29). . . . The undersigned finds that controlling weight (Social Security Ruling 96-2p) cannot be given to th[is] treating physician['s] opinions on the ultimate opinion reserved to the Commissioner (Social Security Ruling 96-5p) because [it is] not warranted by the overall medical evidence of record (R. 31).

Dr. Pondo's opinion that Plaintiff could not lift "in a competitive work situation" was not supported by objective medical evidence, and it was inconsistent with other evidence of record. As noted above, there were no lumbar or thoracic MRI's or x-rays test results in the evidence of record that supported such a limitation (See. pp. 41-42 of this document). Plaintiff's June 16, 2004, chest x-ray was normal (R. 193). On July 28, 2006, Plaintiff had a chest x-ray made. The reason for the examination was COPD and wheezing. The x-ray was negative (R. 332, 333). The pulmonary function test, completed by Plaintiff and referred to by Dr. Pondo on August 16, 2006, showed severe obstructive pattern; however, Dr. Pondo opined that Plaintiff showed excellent response to bronchiodilators (R. 29).

Additionally, Dr. Pondo's finding that Plaintiff could not lift due to asthma/bronchitis symptoms is inconsistent with the other evidence of record. Dr. Rahman noted, on June 23 and 25, 2004, and January 26, February 10, February 24, and May 25, 2005, that his examinations of Plaintiff's respiratory system were normal (R. 176, 177, 227, 230, 232, 233, 236-38). Dr. Parviz noted Plaintiff's respiratory and lung examinations were normal on September 27, 2005 (R. 219). Dr. Parviz did not find any respiratory distress during his November 17, 2005, examination of Plaintiff (R. 294) and he found Plaintiff demonstrated prolonged expiration of breath on February 10, 2006 (R. 290). On February 24, 2007, Plaintiff's lungs, according to the results of an examination conducted by Dr. Parviz, were clear to auscultation (R. 287-88). Dr. Zuriqat completed a sleep study of Plaintiff; the study "ruled out" obstructive sleep apnea (R. 302). Even

though Plaintiff presented with wheezing on June 17, 2006, to P. A. Leach (R. 283, 285-87), on June 30, 2006, Dr. Parviz noted Plaintiff's wheezes were reduced to a "few" (R. 282). Plaintiff's July 6, 2006, pulmonary function analysis produced results that required additional testing; Plaintiff put forth poor effort (R. 297). On August 10, 2006, Plaintiff informed Dr. Parviz that his breathing had improved with the use of Advair. Dr. Parviz found Plaintiff breathed without effort and his breath expiration was prolonged. Dr. Parviz opined Plaintiff's asthma had improved (R. 29, 328). On September 12, 2007, Dr. Parviz found Plaintiff breathed without effort, his lungs were clear to auscultation, and his expiration was prolonged (R. 29).

Finally, Dr. Pondo's opinion that Plaintiff could not lift is inconsistent with his own opinions as found in the record. As noted above, Plaintiff's PFT showed severe obstructive pattern with excellent response to bronchiodilators (R. 29). Dr. Pondo found Plaintiff's FEV1 had improved from 16% to 56% on September 13, 2006. Also on that date, Dr. Pondo found Plaintiff's asthma was clinically improving; his chest was clear to auscultation (R. 29, 342, 343). In his Pulmonary Residual Functional Capacity Questionnaire, Dr. Pondo found Plaintiff had no side effects to his medications that would impede his working. Dr. Pondo opined Plaintiff's prognosis was fair (R. 339). Dr. Pondo's opinion that Plaintiff cannot lift "in a competitive work environment" is not supported by the objective medical evidence and is inconsistent with the evidence of record.

The Fourth Circuit has held, in *English v. Shalala*, 10 F.3d 1080, 1085 (1993), that when "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment" (citing, *Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir. 1989). In this case, the ALJ did include limitations that were supported by all the relevant

evidence of record as to Plaintiff's impairments. The evidence of record does not support a finding that Plaintiff cannot lift and that Plaintiff would be absent from work for up to three days per month due to him impairments. Substantial evidence supports the ALJ's RFC, the ALJ's hypothetical to VE, and the weight assigned by the ALJ to the opinions of Drs. Topping and Pondo. The ALJ's decision is supported by substantial evidence.

### E. Appeals Council

In his Motion for Summary Judgment, Plaintiff contends the ALJ erred by failing to consider the additional evidence regarding Plaintiff's mental health. According to Plaintiff's argument, the evidence was an intake evaluation, completed at Appalachian Community Health Center, on January 10, 2007 (Plaintiff's brief at p. 13). Defendant contends there is no relevant mental health evidence that warrants a remand. The undersign agrees.

In its decision to deny Plaintiff's request for review, the Appeals Council opined, on December 14, 2007, the following:

> We also looked at medical records from the Appalachian Community Health Center dated January 10, 2007 and the medical report from Sharon Joseph, Ph.D. dated February 12, 2007. The Administrate Law Judge decided your case through December 11, 2006. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before December 11, 2006. Our records show that this new information has been made a part of the record in the subsequent application you filed on December 18, 2006 (R. 4-5).

20 C.F.R. § 404.970 provides, in pertinent part, the following:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

It is clear that the medical record in question is evidence that does not relate to the period on or before the date of the administrative law judge's hearing decision; the evidence was created one month and two months after the decision was issued by the ALJ. According to Plaintiff's argument, the intake evaluation report was dated January 10, 2007. The Appeals Council also considered a February 12, 2007, report by Ms. Joseph. The ALJ conducted the Administrative Hearing on September 20, 2006; his decision was rendered on December 11, 2006 (R. 33, 362). It is indisputable that both records were created after the ALJ's decision was rendered. As the Appeals Council correctly stated, the evidence related to a "later time" and was being addressed in a new and separate application filed by Plaintiff on December 18, 2006 (R. 4-5). The Appeals Council complied with 20 C.F.R § 404.970; therefore, the Commissioner's decision is supported by substantial evidence.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and

Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _1_ day of _December_, 2008.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE